# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

KEVIN DAHLBERG,                          1:11-cv-00967-LJO-DLB (HC)

              Petitioner,

     v.                                FINDINGS AND RECOMMENDATION
                                         REGARDING PETITION FOR WRIT OF
                                         HABEAS CORPUS

GARY SANDOR,                             [Doc. 1]

              Respondent.

_____/

     Petitioner is proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]

## BACKGROUND

     Following a jury trial in the Tulare County Superior Court, Petitioner was convicted of driving under the influence causing injury (Veh. Code § 23153, subd. (a); count 1) and driving under the influence, while having a blood alcohol content of .08 percent or higher, causing injury (Veh. Code § 23153, subd. (b); count 2).  As to each count, the jury found true the allegations that Petitioner personally inflicted great bodily injury on Sergeant Kerry Kelly (Pen. Code § 12022.7, subd. (a)).  In a bifurcated proceeding, the jury found true the allegations that, in the past 10 years, Petitioner had suffered two prior convictions for driving under the influence (Veh. Code § 23566).  Petitioner was sentenced to a total term of six years in prison.

---

[1] Respondent submits that Gary Sandor is the current warden at California Rehabilitation Center and requests that this Court substitute Warden Sandor in place of former Warden JoAnn Gordon as Respondent in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1    Petitioner filed a timely notice of appeal.  The California Court of Appeal, Fifth Appellate

2    District affirmed the judgment.  (LD 4.)  On December 9, 2010, the Court of Appeal denied a

3    petition for rehearing.  (LD 6.)

4        On December 28, 2010, Petitioner filed a petition for review in the California Supreme

5    Court.  (LD 7.)  The petition was summarily denied March 2, 2011.  (LD 8.)

6        Petitioner filed the instant petition for writ of habeas corpus on June 13, 2011.

7    Respondent filed an answer to the petition on September 20, 2011, and Petitioner filed a traverse

8    on October 13, 2011.

9                          STATEMENT OF FACTS[2]

10       On appeal, [Petitioner] contends: (1) the trial court erred in precluding him
     from arguing that Sergeant Kelly's conduct was a superseding cause of his own
11   injuries; (2) the trial court made two erroneous evidentiary rulings that were
     cumulatively prejudicial with respect to his defense that he was not the driver of
12   the van involved in the collision that injured Sergeant Kelly; (3) insufficient
     evidence supports the great bodily injury enhancement because there was no
13   evidence [Petitioner] personally inflicted Sergeant Kelly's injuries; and (4) the
     Vehicle Code section 23566 enhancement must be reversed because the trial court
14   did not properly identify [Petitioner] as the person who suffered the underlying
     prior convictions for driving under the influence, and the evidence of the prior
15   convictions constituted inadmissible hearsay and violated the Sixth Amendment
     right to confront witnesses under *Crawford v. Washington* (2004) 541 U.S. 36
16   (*Crawford*).  We affirm.

17   **FACTS**

18       On April 19, 2008, beginning around 6:00 p.m., [Petitioner] visited several
     bars in Visalia and became intoxicated.  He arrived at the Green Olive bar around
19   7:00 p.m. and ordered a shot of tequila and a bottle of beer.  The bartender, Bobbi
     Cansler, took the drinks away from [Petitioner] before he had a chance to
20   consume them after she saw he was already ver intoxicated.

21       Around 8:00 p.m., Cansler saw two of her customers, Daniel Hays and
     Lisa Silva, take [Petitioner] to the front door and try to give him some water.
22   They then took [Petitioner] outside to sleep in his van and brought water out to
     him.  Silva later came back to the bar and got a sandwich and a towel to take out
23   to [Petitioner].

24       Hays and Silva both testified that when they saw [Petitioner] at the Green
     Olive bar he appeared very drunk.  He was staggering around and slurring his
25   words.  Hays took [Petitioner's] keys from him and told him, "You're not
     driving."  He also offered to drive [Petitioner] wherever he wanted to go.

26

27       [2] This statement of facts is taken from the California Court of Appeals, Fifth Appellate District's **XXX**,
     opinion submitted as Lodged Document 4, which is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).  Thus, the
28   Court adopts the factual recitations set forth by the state appellate court.

1
2
3
4

    While Silva was playing pool with her pool league, Hays played a game of pool with [Petitioner]. [Petitioner] was so drunk, Hays had to keep him from falling down numerous times.  Afraid [Petitioner] was going to fall and crack his head open on the pool table, Hays told [Petitioner] he needed to go sleep in his van.  Around 8:00 p.m., Hays took [Petitioner] to his van, and [Petitioner] went to sleep on the floor between the front seats.  Hays went out to the van to check on [Petitioner] a few times and brought [Petitioner] a pitcher of water.

5
6
7
8

    At approximately 10:00 p.m., Hays and Silva left the Green Olive bar to give [Petitioner] a ride home.  Hays drove [Petitioner's] van with [Petitioner] in the passenger seat, while Silva followed in her car. [Petitioner] asked Hays to drive him to the Capri Motel, which was not far from the bar.  Right before they reached the motel, [Petitioner] asked Hays to park his van in the parking lot of the Corner Café, where there was a security light and the van would be in plain view.  The Corner Café was right next door to the Capri Motel.

9
10
11
12

    After parking [Petitioner's] van, Hays took the keys out of the ignition and handed them to [Petitioner].  He assumed [Petitioner] was going to go to the motel and sleep like he said he was going to do.  After taking [Petitioner] to the Corner Café parking lot, Hays and Silva drove back to the Green Olive bar because Silva had one more game left to play with her pool league.  Silva testified that when they left [Petitioner], [Petitioner] was still seated in the passenger seat of his van.

13
14
15

    Around 10:30 p.m., Kerry Kelly, a sergeant with the Tulare County Sheriff's Department, came across [Petitioner's] van, which was facing north and parked vertically across the westbound lane of Avenue 320, a rural two-lane road outside of Visalia.  The van had no lights on and there were no street lights or other sources of light near the location.

16
17
18
19
20
21

    Sergeant Kelly parked his patrol car on the shoulder of the eastbound lane and pointed his spotlight in a northern direction to light up the van and its license plate.  Sergeant Kelly then got out of his car and approached the van on the passenger side.  He looked inside the van with his flashlight and saw [Petitioner] lying asleep on the floor between the front driver and passenger seats.  Sergeant Kelly testified that it appeared as though [Petitioner] had been sitting in the driver's seat and had fallen out, noting that [Petitioner's] feet were resting on the floorboard of the driver's seat.  The last thing Sergeant Kelly remembered before waking up in the hospital was knocking on the window and [Petitioner] looking up at him.

22
23
24

    While Sergeant Kelly was outside [Petitioner's] van, another car traveling in the westbound lane collided with the van.  The driver, Salvador Valdovinos, testified that around 10:30 p.m., he was driving home on Avenue 320, when his vision of the road in front of him was obscured by "the highbeams of another car."  Later in his testimony, Valdovinos confirmed that the bright lights he saw came from Sergeant Kelly's vehicle, which was parked on the side of the road.

25
26
27

    Because he could not see ahead of him, Valdovinos tried to focus on the center yellow line in order to stay in his lane.  Once he passed the bright lights, he suddenly saw [Petitioner's] van parked across the westbound lane.  Valdovinos pressed his brakes but his car did not stop in time.  His car slid and slammed into the rear portion of [Petitioner's] van on the passenger side.

28

    After he slammed into [Petitioner's] van, Valdovinos got out of his car to

check if everyone was alright.  He found [Petitioner] and Sergeant Kelly, both unconscious, lying on the ground off to the side of the road.  After the collision, [Petitioner's] van was facing east and Valdovinos's car was "totaled."

After receiving a call from dispatch just after 10:30 p.m., Frank Freeman, an officer with the California Highway Patrol, responded to the collision.  When he arrived, he saw two wrecked vehicles and a sheriff's patrol vehicle.  Medical personnel were also on the scene. [Petitioner] and Sergeant Kelly were lying on the north shoulder of the road.

Based on his investigation of the accident scene, Officer Freeman opined that, prior to the accident, [Petitioner's] van was parked in the middle of the road, facing north.  It was mainly in the westbound lane and partially on the shoulder. Valdovinos was unable to stop in time and collided with the right side of [Petitioner's] van.  The resulting damage did not indicate that Valdovinos had been traveling at an excessive rate of speed but rather had been driving between 50 and 55 miles per hour.  The speed limit on Avenue 320 is 55 miles per hour.

Officer Freeman opined that [Petitioner] and Sergeant Kelly had been standing near the left rear of the van when the collision occurred.  Upon impact, the van had swung to the left in a westerly direction, hitting [Petitioner] and Sergeant Kelly and whipping them on the shoulder of the road.

After the accident, Officer Freeman interviewed [Petitioner] at the hospital. [Petitioner] told the officer he did not have much recollection of the accident.  He remembered being awoken by Sergeant Kelly and directed to get out of the van. [Petitioner] did not know how he got to Avenue 320.  He was so drunk that night, he blacked out.

[Petitioner] told Officer Freeman that he went to three different bars that night, ending with the Green Olive bar. [Petitioner] admitted that he drove from one bar to the other and that he had been drinking tequila and Budweiser.

About 10 days after the accident, Officer Freeman drove [Petitioner] from the hospital to the jail.  At this time, [Petitioner] told Officer Freeman that he had money that was no longer in the van.  However, he did not ask the officer to file a report concerning the missing money.

Toxicological tests revealed that when [Petitioner's] blood was drawn after the accident at 12:30 a.m., he had a blood alcohol content of .20 percent. Assuming he stopped drinking around 8:00 p.m., his blood alcohol content at 10:30 p.m. would have been around .26 percent.

### The Defense

The defense argued there was insufficient evidence [Petitioner] drove his van out to Avenue 320, and posited a theory that Hays and Silva were the ones who drove [Petitioner] out to the country, possibly to steal money from [Petitioner].

In support of this theory, the defense relied, in part, on inconsistencies between the version of events Hays and Silva testified to at trial and statements they made to other witnesses nearer to the time of the accident.  In this regard, defense counsel elicited testimony from Officer Freeman that Hays and Silva both told him, that after they dropped off [Petitioner] at the motel, they went home, not

4

back to the Green Olive bar like they testified at trial.

The defense also called three witnesses, including Gayle Goldsmith, a bartender of a bar in Exeter frequented by Hays and Silva. Goldsmith testified that sometime in May 2008, they came to pick up some concert tickets she was holding for them behind the bar. Hays volunteered to Goldsmith that on the night of the accident, he dropped [Petitioner] off at the Capri Motel and that he actually watched [Petitioner] get out of the van and approach a room at the motel. Silva also indicated to Goldsmith that she observed [Petitioner] exit the van and walk towards a room at the Capri Motel.

Teresa Taylor, who was working at the Capri Motel on the night of the accident, testified that she did not recall seeing a van pull into the motel parking lot that evening. Taylor acknowledged that she had told the defense investigator if someone in a van had come through to rent a room, she would have seen it because the motel parking lot is very small.

Taylor confirmed that the Corner Café is next to the Capri Motel, but she described them as having two distinct parking lots and testified that the café parking lot was "not even close to the parking lot of the motel." She acknowledged, however, that there was "a little drive - - like a fire exit" connecting the two parking lots, which someone could use to drive from one parking lot to the other. On cross-examination, Taylor confirmed that from the area where she worked at the motel, she was unable to see the Corner Café parking lot.

Rod Hudspeth, the owner of Hudspeth Construction, testified that on April 29, 2008, he wrote and delivered to [Petitioner] a check for a painting job [Petitioner] had done for him.

(LD 4, at 2-7.)

DISCUSSION

I.   <u>Jurisdiction</u>

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. <u>Lindh v. Murphy</u>, 521 U.S. 320, 327 (1997); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499

1   (9th Cir. 1997), *cert. denied,* 522 U.S. 1008 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751,

2   769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997).  The instant petition was

3   filed after the enactment of the AEDPA and is therefore governed by its provisions.

4   II.    Standard of Review

5          The instant petition is reviewed under the provisions of the Antiterrorism and Effective

6   Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63,

7   70 (2003).  Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

8   barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

12  28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

13  (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

14         As a threshold matter, this Court must "first decide what constitutes 'clearly established

15  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

16  *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

17  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

18  of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

19  'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

20  set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,

21  the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

22  principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

23  . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

24  review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van

25  Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

26  Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

27  end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

1    at 126; Moses, 555 F.3d at 760.

2        If the Court determines there is governing clearly established Federal law, the Court must

3    then consider whether the state court's decision was "contrary to, or involved an unreasonable

4    application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, quoting 28

5    U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if

6    the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

7    question of law or if the state court decides a case differently than [the] Court has on a set of

8    materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

9    72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in

10   character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, quoting Webster's Third

11   New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to

12   [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

13   governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

14   clearly established Supreme Court precedent, the state decision is reviewed under the pre-

15   AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

16       "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

17   the state court identifies the correct governing legal principle from [the] Court's decisions but

18   unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

19   "[A] federal court may not issue the writ simply because the court concludes in its independent

20   judgment that the relevant state court decision applied clearly established federal law erroneously

21   or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

22   538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists

23   could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

24   Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the

25   correctness of the state courts decision, the decision cannot be considered unreasonable.  Id.  If

26   the Court determines that the state court decision is objectively unreasonable, and the error is not

27   structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

28   effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669 (9th Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

III.   Insufficient Evidence To Support Great Bodily Injury Enhancement

Petitioner contends there was not substantial evidence to support the great bodily injury enhancement because there was no evidence he personally inflicted the injury on the victim.

In the last reasoned decision of the California Court of Appeal, Fifth Appellate District,[3] the claim was rejected as follows:

> [Petitioner] contends insufficient evidence supports the great bodily injury enhancement because there was no evidence he personally inflicted any injury on Sergeant Kelly because "a third party was the one who struck the van which injured the officer."  We conclude that the evidence was sufficient to support the enhancement because a reasonably jury could find that [Petitioner's] act of

---

[3] Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

parking his van across the westbound lane of Avenue 320 was both a direct and proximate cause of the vehicle collision in this case.

Section 12022.7, subdivision (a) provides: "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."

As used in section 12022.7, "to 'personally inflict' an injury is to directly cause an injury, not just to proximately cause it." (*People v. Rodriguez* (1999) 69 Cal.App.4th 341, 347.) "To 'personally inflict' injury, the actor must do more than take some direct action which proximately causes injury. The defendant must directly, personally, himself inflict the injury." (*Id.* at p. 349; *People v. Cole* (1982) 31 Cal.3d 568, 572-573 (*Cole*) [great bodily injury enhancement applies only to a person who "directly acted to cause the injury" and who "himself [or herself] inflicts the injury"].)

We applied this standard in *People v. Guzman* (2000) 77 Cal.App.4th 761 (*Guzman*), where the defendant was driving with a blood alcohol level of .10 percent when he made an "unsafe left turn in front of another vehicle. Due to [Guzman's] action, a collision occurred and [Guzman's] passenger . . . was injured." (*Guzman, supra*, 77 Cal.App.4th at p. 763.) In a court trial, Guzman was convicted of driving under the influence and causing bodily injury to another; the court also found Guzman had personally inflicted great bodily injury on his passenger. On appeal, Guzman challenged the latter finding. Guzman argued that he did not personally inflict great bodily injury on the passenger because, although the passenger would not have been injured if he had not made an unsafe left turn, the other driver involved in the accident was the one who directly performed the act that caused the injury. (*Guzman, supra*, 77 Cal.App.4th at p.764.) In rejecting this argument, we held that the defendant had personally inflicted the injuries on his passenger. We said, "Here, [Petitioner] turned his vehicle into oncoming traffic. This volitional act was the direct cause of the collision and therefore was the direct cause of the injury. [Petitioner] was not merely an accomplice. Thus, [Petitioner] personally inflicted injury on [the victim]. Further, the accidental nature of the injuries suffered does not affect this analysis. The 1995 amendment to section 12022.7 deleted the requirement that the defendant act 'with the intent to inflict the injury.'" (*Guzman, supra*, 77 Cal.App.4th at p.764.) Here, [Petitioner] directly performed the act that caused the injuries to the victim by illegally parking his unlit van across the westbound lane of Avenue 320, where it was struck by another vehicle traveling in that lane. [Petitioner's] act was a volitional act, similar to Guzman's act of turning into oncoming traffic, and the injuries to the victim occurred as a direct consequence of [Petitioner's] act of parking his vehicle in the lane. Thus, [Petitioner] personally inflicted the great bodily injury.

In his opening brief, [Petitioner] relies on *People v. Cross* (2008) 45 Cal.4th 58 (*Cross*) to support his argument that he did not personally inflict great bodily injury. In *Cross*, a jury convicted the defendant of, inter alia, a nonforcible great bodily injury (§ 12022.7, subd. (a)). (*Cross, supra*, 45 Cal.4th at p.63.) The defendant impregnated his stepdaughter who obtained an abortion with the defendant's encouragement. (*Id*. at pp.61-62.) *Cross* rejected the defendant's contention that "a pregnancy without medical complications . . . can never support a finding of great bodily injury." (*Id*. at pp. 63-66.) *Cross* found that the evidence of the pregnancy under the circumstances supported the great bodily injury finding. (*Id*. at 66.) *Cross* determined that the trial court's error in instructing that

1   an abortion could also constitute great bodily injury (defendant did not
    "personally" perform the abortion) was a technical error. (*Id.* at pp. 66-67.) *Cross*
2   also rejected the defendant's claim that the prosecutor's arguments misled the jury
    to conclude that in facilitating the abortion, the defendant personally inflicted
3   great bodily injury. (*Id.* at pp. 67-69.)

4          Contrary to [Petitioner's] assertions, the actions of the driver that collided
    with [Petitioner's] van are not comparable to the doctor who performed the
5   abortion on the victim in *Cross*, and did not show that [Petitioner] did not
    personally inflict Sergeant Kelly's injuries. As discussed above, by parking his
6   unlit van across the westbound lane of Avenue 320, [Petitioner] personally
    performed an act that both directly and proximately caused the collision with the
7   other car traveling in that lane.

8          In his reply brief, [Petitioner] relies less on the *Cross* decision and more on
    *Cole*, *supra*, 31 Cal.3d 568 to support his claim he did not personally inflict
9   Sergeant Kelly's injuries. However, that case is also inapposite. In *Cole*, the
    defendant had directed another person to attack the victim. The Supreme Court
10  held that an enhancement under section 12022.7 may be imposed "only on those
    principals who perform the act that directly inflicts the injury" and not on an aider
11  and abettor. (*Cole*, *supra*, 31 Cal.3d at p. 571.) "[T]he enhancement applies only
    to a person who himself inflicts the injury . . . . Among the several dictionary
12  definitions of 'personally,' we find the relevant meaning clearly reflecting what
    the Legislature intended: 'done in person without the intervention of another;
13  direct from one person to another.' (Webster's New Internat. Dict. (3d ed. 1961).)
    No other expression could have more clearly and concisely expressed what we
14  interpret to be the plain meaning of the Legislature: that the individual accused of
    inflicting great bodily injury must be the person who directly acted to cause the
15  injury. The choice of the word 'personally' necessarily excludes those who may
    have aided or abetted the actor directly inflicting the injury." (*Cole*, *supra*, 31
16  Cal.3d at p. 572.)

17         Unlike the defendant in *Cole*, [Petitioner] was not prosecuted as an aider
    and abettor or under a theory of vicarious liability. Nothing in the language of the
18  statute or the *Cole* decision adds a requirement that the defendant's acts alone
    must inflict the great bodily injury. And, in fact, the contrary is true. "More than
19  one person may be found to have directly participated in inflicting a single
    injury." (*Guzman*, *supra*, 77 Cal.App.4th at p. 764.) Here, no one but [Petitioner]
20  parked his dark van in the middle of the road where another vehicle collided with
    it. The collision was both a direct and foreseeable result of [Petitioner's] act. The
21  evidence was therefore sufficient to support a finding that [Petitioner] both
    personally inflicted and proximately caused Sergeant Kelly's injuries.

22

23  (LD 4 at 16-19.)

24         The law on insufficiency of the evidence claim is clearly established. The United States

25  Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

26  federal court must determine whether, viewing the evidence and the inferences to be drawn from

27  it in the light most favorable to the prosecution, any rational trier of fact could find the essential

28  elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).

1  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

2         A jury could have reasonably found that Petitioner's sole act of parking his van across a

3  dark roadway at night with his lights off directly caused the accident.  Therefore, under theses

4  circumstances injury was foreseeable.  Petitioner's claim that Sergeant Kelly was a superseding

5  and intervening cause of the accident is incorrect.  The Court of Appeal reasonably applied the

6  applicable state law and determined that upon discovering Petitioner's van in the middle of the

7  roadway, Sergeant Kelly had a duty to stop and investigate.  Such action on Sergeant Kelly's part

8  did not break the chain of causation, as it was Petitioner's direct action which caused the

9  Sergeant to stop.  Petitioner's act directly caused Sergeant Kelly's injury, even if he may have

10 contributed to the cause.  Petitioner should have foreseen that if a police officer observed his van

11 parked in roadway at night, the officer has a duty to stop and investigation by using lights to view

12 inside the vehicle which could lead to an accident causing injury.  While the precise events of the

13 accident may not have been predictable, it was fully predictable that by parking his van in the

14 middle of the roadway at night an accident resulting in injury could result.  There is nothing in

15 manner in which the accident resulted that was a superseding cause of the victim's injury.

16        Given the facts of this case, the California Court of Appeal's rejection of Petitioner's

17 sufficiency of the evidence claim was a reasonable construction of the evidence and was not

18 contrary to or an unobjectively unreasonable application of clearly established federal law.  28

19 U.S.C. § 2254(d).  Accordingly, Petitioner fails to establish habeas corpus relief.

20 IV.    Constitutional Right To Present Defense Of Superseding Cause

21        Petitioner contends his constitutional right to present a defense was violated when he was

22 precluded from arguing that the officer's conduct was a superseding cause of the vehicle

23 collision.  The appellate court rejected the claim reasoning as follows:

24              [Petitioner] contends the trial court erred in violation of his constitutional
          right to present a defense by precluding him from arguing that Sergeant Kelly's
25        own conduct was a superseding cause of the vehicle collision and therefore
          absolved [Petitioner] of criminal liability for the resulting injuries to Sergeant
26        Kelly.  We disagree and find that the trial court correctly concluded that, as a
          matter of law, the sergeant's conduct did not constitute a superseding cause of the
27        accident that injured him.

28            A.    Background

The asserted error stems from an in limine hearing on the prosecution's motion to prevent the defense from "argu[ing] theories or ask[ing] questions regarding contributory negligence." At the hearing, defense counsel agreed with the prosecutor that "contributory negligence is not a defense [to] a criminal act." However, defense counsel asserted: "[T]he case law is very clear that a superseding event that is unforeseeable that amounts to more than contributory negligence would be a complete and utter defense in this matter." Defense counsel went on to posit that the evidence to be presented at trial would permit the jury to find that Sergeant Kelly's actions constituted a superseding cause of the accident that injured him. In this regard, defense counsel argued:

> "If Salvador Valdovinos testifies as I anticipate he will that he was blinded by these bright lights [on Sergeant Kelly's patrol vehicle] and he could not see anything, that would be a supervening event that was not foreseeable by [Petitioner] parked in his van in the road, assuming he were the driver of the vehicle, and, therefore, it would not be foreseeable for someone parking a vehicle on the road that another vehicle would blind a third party thereby causing that third party to hit the van."

The trial court rejected defense counsel's argument and concluded that because the asserted actions of Sergeant Kelly were foreseeable they were insufficient, as a matter of law, to constitute a superseding cause of the accident. The trial court thus reasoned:

> "The turning on of lights by a police officer at the top of his car is not an unforeseeable act. It is absolutely foreseeable that if you park your car in the middle of the road at night with your lights off, that a police officer is going to come on the scene, pull over, turn on his overhead lights, and investigate. That is not an unforeseeable act. That is a totally foreseeable act. And it's not an intervening act.

> "The act in this case that caused the accident is the defendant stopping in the middle of the road, if in fact he did. The evidence shows that, with his lights off at night, that caused the accident. The officer has a duty to stop. He has a duty to turn on his lights, has a duty to investigate. And given that, unless I hear something else, my position is, is that that's not an unforeseeable intervening act. The cause of the accident was the defendant's violation of the Vehicle Code by parking his car in the middle of the road at night with his lights off." [N.2]

[N.2] Earlier in the hearing, the trial court likewise reasoned: "[T]he fact of the matter is, is that had the defendant not parked in the middle of the road, the officer would not have had to stop his vehicle, turn on his emergency lights, and the accident would not have occurred. There isn't a casual relationship between the officer turning on his lights and the accident. The fact of the matter is the defendant parked in the middle of the road, the officer did not park in the middle of the road. The officer had to approach the vehicle and contact the person in the vehicle. It's not a comparative negligence case. But for the fact that the defendant parked in the road, this accident would not have occurred."

A little later, the trial court stated: "And I'm going to advise the jury that if we get to that point, if that issue comes up, the causation, this is not an

12

unforeseeable event, that the lights of a police vehicle being on is totally foreseeable when a person parks at night blocking a lane, across the lane, and causes - - as a result of that an accident occurs.  So that's basically my ruling."

[Petitioner] did not renew the issue at a later time, proffer any additional evidence of a superseding cause, or request an instruction on superseding causation.

On the issue of causation, the jury was instructed with a modified version of CALCRIM No. 240 as follows:

"An act causes injury if the injury is the direct, natural, and probable consequence of the act and the injury would not have happened without the act.  A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

"There may be more than one cause of injury.  An act causes injury, only if it is a substantial factor in causing the injury.  A *substantial factor* is more than a trivial or remote factor.  However, it does not have to be the only factor that causes the injury.

"If you find a causal connection between the defendant's conduct and the harm suffered by Sergeant Kerry Kelly, then you are not to consider any contributory negligence of either Sergeant Kerry Kelly or Salvador Valdovinos in determining whether the defendant's conduct is a *substantial factor* in causing the injury." Similar language respecting causation was repeated in CALCRIM No. 2100 (driving under the influence causing injury) and CALCRIM NO. 2101 (driving with a .08 percent blood alcohol causing injury).

**B.    *Analysis***

In *People v. Cervantes* (2001) 26 Cal.4th 860, our Supreme Court discussed what constitutes an intervening, superseding cause.  "'In general, an "independent" intervening cause will absolve a defendant of criminal liability. [Citation.]  However, in order to be "independent" the intervening cause must be "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause." [Citation.] On the other hand, a "dependent" intervening cause will not relieve the defendant of criminal liability. "*A defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause.  If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is 'dependent' and not a superseding cause, and will not relieve defendant of liability*. [Citation.] '[] The consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. [] *The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act*.'"'" (*Id*. at p. 871, italics added.)

Applying these principles here, it becomes apparent that, although Sergeant Kelly's conduct was undeniably a *contributing cause* of the accident, the

trial court correctly concluded his conduct did not, as a matter of law, rise to the level of an *exonerating superseding cause*. The evidence established that, after driving under the influence of alcohol, [Petitioner] parked his darkened van across the westbound lane of Avenue 320, thereby obstructing the lane and posing a risk of collision with other motorists traveling in the lane. As the trial court pointed out during the in limine hearing, Sergeant Kelly's act of stopping to investigate and using the lights on his patrol car to illuminate [Petitioner's] van was a foreseeable result of [Petitioner's] original act of parking his van in the middle of the road. Therefore, it was a dependent intervening cause that did not relieve [Petitioner] from criminal liability.

[Petitioner] recognizes the evidence presented at trial was sufficient to establish his actions caused Sergeant Kelly's injuries under the principles of causation on which the jury was properly instructed. However, he asserts that, given the opportunity, "a jury might reasonably have found the conduct of the police officer to be a superseding cause." [Petitioner] does not expressly argue or present any authority supporting the conclusion that Sergeant Kelly's conduct in this case was so extraordinary and unforeseeable it could reasonably be deemed an independent intervening event or superseding cause of the accident, relieving [Petitioner] from criminal liability for Sergeant Kelly's injuries. Instead, [Petitioner] simply asserts this was a question for the jury to decide and the court therefore erred by not allowing the defense to present its theory of superseding causation. We would see merit in [Petitioner's] contention if there had been evidence supporting the theory, but the defense made no offer of proof of any evidence that was legally sufficient to show a superseding cause.

The case [Petitioner] relies on to argue that the trial court deprived him of the right to present a defense is inapposite. *Homes v. South Carolina* (2006) 547 U.S. 319 involved a situation where a state court evidentiary rule barred the defendant in a death penalty case from introducing proof of third party guilt when the prosecution introduced forensic evidence that strongly supported a guilty verdict. (*Id.* at pp. 321, 331.) No category of evidence was excluded in this case by any comparable rule of evidence. Contrary to [Petitioner's] assertion, the trial here did not make a finding that "the evidence of causation was sufficiently strong to preclude the defense from offering any evidence to rebut it." Rather, the trial court simply found that the anticipated evidence that Sergeant Kelly's lights blinded Valdovinos and prevented him from seeing [Petitioner's] van in time to avoid the collision, none of which was excluded, was legally insufficient to constitute a superseding cause of the accident and thus prohibited the defense from making this argument to the jury or exploring such theory on cross-examination. For reasons discussed above, the trial court's ruling was legally correct and did not deprive [Petitioner] of his right to present a defense.

(LD 4 at 7-12.)

"[T]he Constitution guarantees criminal defendant's a 'meaningful opportunity to present a complete defense.'" <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) (quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984)). However, "[t]he accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." <u>Taylor v. Illinois</u>, 484 U.S. 400, 410 (1988). The Supreme Court has found

1    "the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has

2    infringed upon a weighty interest of the accused."  United States v. Scheffer, 523 U.S. 303, 308

3    (1998).  A state court's interpretation of state law binds a court sitting in habeas corpus.

4    Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

5         The California Court of Appeal applied California law and found that Sergeant Kelly's

6    actions were not an intervening and superseding cause of the accident, and determined the trial

7    court's exclusion of such defense was proper.  (LD 4 at 8-9, 11-12.)  The appellate court's

8    interpretation of California law is binding on this Court.  Bradshaw, 546 U.S. at 76.  Although

9    Petitioner does not agree with the state court's ruling, this Court cannot second-guess the

10   conclusion under state law, and habeas corpus relief is foreclosed.

11   V.    Denial Of Right To Fair Trial-Failure To Present Defense That Not Driver Of Vehicle

12        Petitioner contends the trial court erred by failing to allow him to present the defense

13   theory that he did not drive the van to the accident site.

14        In denying this claim, the California Court of Appeal reasoned as follows:

15              A.    *Admission of Sergeant Kelly's Opinion Appellant was Driver of Van*

16

17              First, [Petitioner] attacks, as unqualified expert opinion, Sergeant Kelly's
        testimony that [Petitioner] appeared to have fallen out of the driver's seat.  This
18      assertion of error arises from the trial court's overruling of the defense's
        objection, on the ground that it was speculative, to Sergeant Kelly's testimony that
19      "it looked like [Petitioner] had been sitting in the driver's side and had fallen out
        of the seat."  Assuming [Petitioner] did not forfeit his specific claim of error by
20      failing to raise it below, we agree with respondent that Sergeant Kelly's testimony
        was properly admitted as lay opinion testimony.

21              Lay opinion testimony is admissible if it is rationally based on the
        witness's perception and is helpful to a clear understanding of his or her
22      testimony.  (Evid. Code, § 800.)  The court did not abuse its discretion because
        Sergeant Kelly's opinions met these qualifications.  In his testimony, Sergeant
23      Kelly explained that "it looked like" [Petitioner] had fallen out of the driver's seat
        because [Petitioner's] feet  were "in the area of the floorboard on the driver's
24      side." [Petitioner] was also the only person present and the passenger's side door
        of the van was closed.  These circumstances led the sergeant to conclude that
25      [Petitioner] "looks like the driver" and that "he had passed out from the driver's
        side seat."

26
                Because Sergeant Kelly's conclusions were so obvious and required no
27      expertise or scientific knowledge, we reject [Petitioner's] suggestions they
        amounted to expert conclusions or that they were inadmissible as lay testimony
28      because they were outside the realm of common experience.  (See Evid. Code, §

                                            15

801, subd. (a) [expert opinion limited to testimony about matters beyond average juror's common experience]; *People v. Williams* (1992) 3 Cal.App.4th 1326, 1333.)  In other words, no expertise or scientific knowledge was necessary to conclude [Petitioner] had fallen out of the driver's seat based on the fact that, while he was lying between the front seats, his feet were resting on the floorboard of the driver's seat.  "Lay opinion testimony is admissible where no particular scientific knowledge is required." (*People v. Williams* (1988) 44 Cal.3d 883, 915.)

We see no support in the record for [Petitioner's] assertion in his reply brief that "the sergeant's opinion was phrased as if his experience and training" gave him some extra qualification to render an expert opinion on the issue.  In any event, the jury was properly instructed on evaluation of lay opinion, and told they were free to disregard all or any part of the opinion if they found it "unbelievable, unreasonable, or unsupported by the evidence."  (CALCRIM No. 333.) [N.3]  Given the obvious nature of the sergeant's conclusions, and the jury's ability to easily evaluate for itself the facts underlying that testimony, we presume the jury did not defer to Sergeant Kelly its responsibility to determine whether [Petitioner] drove the van, but instead "'meticulously followed the instructions given.'" (*People v. Cruz* (2001) 93 Cal.App.4th 69, 73; accord, *People v. Clair* (1992) 2 Cal.4th 629, 633, fn. 8; *People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

[N. 3] As given in this case, CALCRIM No. 333 provided: "A witness, who was not testifying as an expert, gave his opinion during the trial.  You may but are not required to accept that opinion as true or correct.  You may give the opinion whatever weigh you think appropriate.  Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion.  You must decide whether information on which the witness relied was true and accurate.  You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

### B.     *Exclusion of Evidence No Money was Found in Appellant's Van*

The second claim of error [Petitioner] asserts is that the trial court erroneously denied his request to call the custodian of records of the tow truck company that towed [Petitioner's] van after the accident to testify that no money was found inside the van when its contents were inventoried. [Petitioner] asserts:

"[The trial court's ruling] precluded the defense from buttressing its theory by proving that there was money missing from the van which could only have been taken by Hayes and/or Silva (setting aside the possibility of official corruption).  The defense theory was that Hayes and/or Silva were motivated to drive [Petitioner], who was unconscious, to an isolate spot to search the van for the proceeds of his paycheck."

The problem with [Petitioner's] argument is that there was no competent evidence establishing that there had ever been any money in the van in the first place.  Thus, the preferred testimony that no money was found in the van after the accident did not tend to show that money previously in the van had been taken, and the trial court properly excluded the testimony as irrelevant. [N. 4] In making its ruling, the trial court accurately observed: "There's been no testimony that there was ever any money in the van.  Unless your client's going to testify, and I don't know what he's going to do, but right now, there is no testimony that there

was ever any money in the van."

[N. 4] "'Only relevant evidence is admissible [citation], and all relevant evidence is admissible unless excluded under the federal or state Constitutions or by statute. [Citations.] The test of relevance is whether the evidence "tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." [Citation.] The trial court has broad discretion in determining the relevance of evidence, but lacks discretion to admit irrelevant evidence. [Citations.] We review for abuse of discretion a trial court's rulings on the admissibility of evidence. [Citations.]' [Citation.]." (*People v. Cowan* (2010) 50 Cal.4th 401, 402.)

In his argument on appeal, [Petitioner] suggests that Officer Freeman's testimony that [Petitioner] made statements claiming money was missing from his van was competent evidence that there had been money in the van and, therefore, the trial court erred in excluding evidence that would have bolstered [Petitioner's] claim.  However, as the trial court correctly observed, [Petitioner's] statements to Officer Freeman were "all hearsay" and "[u]nless there is testimony that he cashed the check and he had the money in his pocket at the time, it really has no evidentiary value."  Thus, when defense counsel asked whether he could rely on Officer Freeman's testimony regarding [Petitioner's] statements as proof of the matter asserted (i.e., that money was missing from the van), the court observed that, although the statements had come in because there was no hearsay objection,

"You can't say it's true because you don't know if it's true. You weren't there.  So you can't vouch for it.  And if you try to vouch for it, I will stop you.  But you can say this is what he told the officer.  And you've got a check to corroborate that.  You can't testify that the check was cashed because you don't know that. That's all I can tell you."

Thereafter, in closing argument, defense counsel briefly conjectured that there was "an issue of possible theft" and noted that there was testimony that [Petitioner] had been paid by Hudspeth and "that money was missing."  But defense counsel stopped there, observing he did not want to "get in trouble" for making "inappropriate" arguments.

We agree with the trial court's assessment that [Petitioner's] statements to Officer Freeman were hearsay and could not be relied on as evidence that money had been taken from [Petitioner's] van.  As discussed above, because there was no competent evidence that there was ever money in [Petitioner's] van to begin with or that [Petitioner] cashed the check he received from Hudspeth, the trial court did not abuse its discretion in excluding, as irrelevant, evidence that the tow truck company found no money inside [Petitioner's] van after the accident.

(LD 4 at 12-16.)

A.    Admission of Sergeant's Kelly's Opinion

Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a federal habeas corpus proceeding. Estelle, 112 S.Ct. at 477; Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Nevertheless, there can be habeas relief for the admission of prejudicial

1  evidence if the admission was fundamentally unfair and resulted in a denial of due process.

2  Estelle, 112 S.Ct. at 482; Pulley v. Harris, 465 U.S. 37, 41 (1984); Walters v. Maas, 45 F.3d

3  1355, 1357 (9th Cir. 1995); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th Cir. 1993); Gordon v.

4  Duran, 895 F.2d 610, 613 (9th Cir.1990).  However, the failure to comply with state rules of

5  evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on

6  due process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919-920 (9th Cir. 1991).  Only if

7  there are no permissible inferences that the jury may draw from the evidence can its admission

8  rise to the level of a due process violation.  Id. at 920.

9     In Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009), the Ninth Circuit

10 explained:

11     Under AEDPA, even clearly erroneous admissions of evidence that render
       a trial fundamentally unfair may not permit the grant of federal habeas corpus
12     relief if not forbidden by "clearly established Federal law," as laid out by the
       Supreme Court.  28 U.S.C. § 2254(d).  In cases where the Supreme Court has not
13     adequately addressed a claim, this court cannot use its own precedent to find a
       state court ruling unreasonable. [Citation.]
14
15     The Supreme Court has made very few rulings regarding the admission of
       evidence as a violation of due process.  Although the Court has been clear that a
16     writ should be issued when constitutional errors have rendered the trial
       fundamentally unfair, [citation], it has not yet made a clear ruling that admission
17     of irrelevant or overtly prejudicial evidence constitutes a due process violation
       sufficient to warrant issuance of the writ.  Absent such "clearly established
18     Federal law," we cannot conclude that the state court's ruling was an
       "unreasonable application." [Citation.] Under the strict standards of AEDPA, we
19     are therefore without power to issue the writ on the basis of Holley's [erroneous
       admission of evidence] claims.
20
21 Holley, 568 F.3d at 1101.

22     Because Petitioner has not set forth any clearly established federal law which requires

23 exclusion of this evidence, the state court's determination that Sergeant Kelly's opinion that it

24 appeared Petitioner had been sitting in the driver's seat of the vehicle was admissible was not

25 contrary to or an unreasonable application of established federal law.

26     Even if Petitioner had established that the state court's determination was contrary to, or

27 an unreasonable application of clearly established federal law, any error was harmless.  Under

28 California law, lay opinion testimony is admissible if it is rationally based on the witness's

perception and is helpful to a clear understanding of his or her testimony.  (Ca. Evid. Code § 800.)  Under Section 800, "[l]ay opinion testimony is not required to be necessary to a clear understanding–it need only be helpful."  (Id.)  Applying this standard, the appellate court reasonably determined that Sergeant Kelly's conclusion that it appeared Petitioner had fallen out of the driver's seat required no expertise or scientific knowledge.  Sergeant Kelly observed Petitioner asleep on the floor of the vehicle between the driver and passenger seats with his feet on the driver's side floorboard.  Petitioner was the only person in the vehicle, and there was no evidence that anyone else was in the vehicle at the time Sergeant Kelly found him.  Petitioner's two friends, Daniel Hays and Lisa Silva, drove Petitioner's car to a parking lot of a hotel and gave Petitioner the keys, just shortly before Sergeant Kelly found Petitioner.  The jury was properly instructed on how to weigh this evidence and specifically advised they were free to disregard all or any part of the opinion if they found it "unbelievable, unreasonable, or unsupported by the evidence.  CALCRIM No. 333.[4]  Under all these circumstances, the Court cannot conclude that any error in the admission of the evidence had a substantial and injurious effect on the jury's verdict.

      B.    Exclusion of Evidence

      Petitioner's claim challenging the exclusion of evidence that no money was found in his vehicle is also without merit.  A state court's evidentiary ruling, even if erroneous, can only result in habeas corpus relief if it rendered the trial so fundamentally unfair as to violate due process.  Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000).  The question here is not whether the state's exclusion of evidence violated state evidentiary rules, but whether the exclusion of evidence resulted in a decision contrary to or that involved an unreasonable application of established Supreme Court precedent.  28 U.S.C. § 2254(d).  "A state court's evidentiary rulings

_____

[4] CALCRIM No. 333 specifically stated: "A witness, who was not testifying as an expert, gave his opinion during the trial.  You may but are not required to accept that opinion as true or correct.  You may give the opinion whatever weight you think appropriate.  Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion, and the facts or information on which the witness relied in forming that opinion.  You must decide whether information on which the witness relied was true and accurate.  You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence."  (CT 146.)

can form the basis for habeas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process." Osborne v. Purkett, 411 F.3d 911, 917 (8th Cir. 2005) (citing Parker v. Bowersox, 94 F.3d 458, 460 (8th Cir. 1996)). "State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes v. South Carolina, 547 U.S. 319, 324 (2006).

The police officer's testimony that Petitioner told him there was a significant amount of money in the van was hearsay, and unless Petitioner testified to such facts it was insufficient to present further evidence in support of such defense. Therefore, the appellate court's determined the trial court properly withheld the admission of evidence that the two truck company did not find any money in the van. In any event, any error did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). During trial, officers testified that Petitioner told them that money was missing from his vehicle. (LD 4 at 15.) Evidence was also admitted which indicated that Petitioner received a paycheck the day of the accident. (Id. at 7.) Thus, the jury was aware of Petitioner's the essence of his claim that money may have been taken from the vehicle. Even so, this evidence (in addition to the facts Petitioner claims were erroneously excluded) would not aid in Petitioner's defense because even if the jurors inferred Petitioner cashed his check and money was missing from the vehicle, the fact remains that there was no evidence that any other person than Petitioner drove to the scene of the collision. Accordingly, any error could not have been prejudicial under Brecht, and habeas corpus relief is foreclosed.

VI.   Trial Court Failed To Identify Petitioner As Person Who Suffered Prior Conviction

Petitioner contends the trial court failed to identify him as the person who suffered the prior convictions introduced by the prosecution.

The California Court of Appeal issued the last reasoned decision denying the claim stating:

**A.   *Court's Alleged Failure to Properly Identify Appellant***

Although [Petitioner] fails specifically to cite the code sections on which he bases his first challenge to the Vehicle Code section 23566 enhancement, we infer that it is based on sections 1025 and 1158. Section 1025, subdivision (c), states in relevant part: "[T]he question of whether the defendant is the person who has suffered the prior conviction shall be tried by the court without a jury." Section 1158 states in relevant part: "Whenever the fact of a previous conviction of another offense is charged in an accusatory pleading, and the defendant is found guilty of the offense with which he is charged, the jury, or the judge if a jury trial is waived, must unless the answer of the defendant admits such previous conviction, find whether or not he has suffered such previous conviction."

The right to a jury trial on prior conviction allegations is purely statutory in nature, and "very limited." (*People v. Epps* (2001) 25 Cal.4th 19, 21, 23 (*Epps*).) It is restricted to having a jury decide whether the defendant "'has suffered'" the prior conviction. (*Id*. at p.23.) The question of the identity of the person who suffered the prior conviction is an issue to be resolved by the court." (*Id*. at pp. 23-25; see §§ 1025, 1158.)

Here, the jury affirmatively answered the question of whether [Petitioner] had suffered the alleged prior convictions. After the jury's verdict, defense counsel asked the trial court whether it had made a finding on the issue of identity. The court stated: "Yes. I did make that finding. I advised the jury that I had found the person named in those exhibits was the defendant." The court apparently was referring to its reading of CALCRIM NO. 21126, [N. 5] to which it added: "It has already been determined that the defendant is the person named in Exhibits 1, 2, and 3. And I make that determination." (Italics omitted.) In *People v. Kelii* (1999) 21 Cal.4th 452, the Supreme Court observed that it is proper for the trial court to first determine whether a defendant is the person who suffered the conviction, and then, if the court finds that the defendant is that person, instruct the jury during the trial of the priors "to the effect that the defendant is the person whose name appears on the documents admitted to establish the conviction." (Id. at p. 458; see also *Epps*, *supra*, 25 Cal.4th at p. 27.)

[N. 5] The trial court instructed the jury pursuant to CALCRIM No. 2126, as follows:

> "The People have alleged that the defendant was previously convicted of other driving under the influence offenses. *It has already been determined that the defendant is the person named in Exhibits 1, 2, and 3. And I make that determination.* [¶] You must decide whether the evidence proves that the defendant was convicted of the alleged crimes. The People allege that the defendant has been convicted of a violation of 23152(b) on July 12th, 2006 in the Tulare County Court in Case Number 167117 and a violation of 23152(b) on August 13th, 2007, Case Number 185186. [¶] In deciding whether the People have proved the allegations, consider only the evidence presented in this proceeding. Do not consider your verdict or any evidence from the early part of the trial. The fact that he's been found guilty of the other - - of those other counts is not evidence in this - - for this issue. You may not return a finding that any of the alleged - - that the alleged convictions have been proven unless all twelve of you agree on that finding." (Italics added.)

In this case, the trial court expressly stated that it had decided the issue of

identity.  Defense counsel's question could not have procured a more explicit finding.  The court's statement alone is sufficient to satisfy the requirement under sections 1025 and 1158.  A court is not required to use any specific words in making its finding and a court can "arguably . . . infer a true finding on the issue of identity" based on the trial court's actions.  (*People v. Belmares* (2003) 106 Cal.App.4th 19, 29.)

[Petitioner] cites no authority for his suggestion that the trial court was required to conduct a separate, formal hearing and make explicit findings on the question of [Petitioner's] identity before proceeding to the jury trial on the prior conviction allegations.  Nor is there any indication in the record that the trial court failed to conduct a meaningful review of the prosecution's documents before determining the issue of identity.  To the contrary, the record reflects that, even before the matter went to the jury, the court discussed the documents with the attorneys and asked questions indicating it had reviewed them and was familiar with their contents.  For example, at one point, the court observed: "It looks like there's a prior prison.  Was that not filed because there's a washout?"  After discussing the apparent prison prior with the attorneys, the court remarked, "I'm just noting that in this package . . . [¶] . . . [¶] . . . but it wasn't charged.  I'm not going to allow it to be charged now."  The record thus belies [Petitioner's] suggestion on appeal that there is no evidence the trial court conducted a meaningful review of the prosecution's evidence in determining the question of identity.

(LD 4 at 19-21.)

Federal habeas relief is available to state prisoners only to correct violations of the United States Constitution, federal laws, or treaties of the United States.  28 U.S.C. § 1154(a).  Federal habeas relief is not available to retry a state issue that does not rise to the level of a federal constitutional violation.  Wilson v. Corcoran, __ U.S. ___, 131 S.Ct. 13, 16, 178 L.Ed.2d 276 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Alleged errors in the application of state law are not cognizable in federal habeas corpus.  Souch v. Schiavo, 289 F.3d 616, 623 (9th Cir. 2002) (a claim challenging state court's discretionary decision concerning application of state sentencing law presented only state law issues and was not cognizable in a proceeding pursuant to 28 U.S.C. § 2254); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).  This Court is bound by a state court's interpretation of state law.  Id.

Petitioner's claim is based on challenge of the application of state law only, i.e. that the trial court's finding that Petitioner was the person who suffered the prior conviction was insufficient under the California Penal Code.  (LD 1 at 26-27.)  The appellate court properly noted that the right to a jury trial on prior convictions is purely statutory and does not implicate

1   any federal constitutional rights.  (LD 4 at 20, citing <u>People v. Epps</u>, 25 Cal.4th 19, 21, 23

2   (2001).)  <u>See</u> <u>also</u> <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000) ("[o]ther than the fact of a

3   prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

4   maximum must be submitted to a jury, and proved beyond a reasonable doubt.")  The issue of

5   whether Petitioner was identified as the person who suffered the prior convictions was properly

6   determined by the state court under California Penal Code sections 1025 and 1158, and the claim

7   is not a cognizable federal habeas corpus claim.

8   VII.   <u>Violation of Sixth Amendment Right By Admitting Hearsay Evidence</u>

9          Petitioner contends the trial court erroneously admitted a certified CLETS printout in

10  violation of his Sixth Amendment right to confrontation.

11         The California Court of Appeal denied the claim in the last reasoned decision stating, in

12  pertinent part:

13         [Petitioner] contends the trial court erred in admitting the CLETS rap sheet
       under the official records or public records exception to the hearsay rule.  In
14     particular, [Petitioner] contends the rap sheet does not satisfy the third prong of
       Evidence Code section 1280 which requires that "[t]he sources of information and
15     method and time of preparation were such as to indicate its trustworthiness."
       (Evid. Code, § 1280, subd. (c).)  In support of his argument, [Petitioner] relies on
16     language contained in the rap sheet itself, which states:

17         "The entries provided below are based upon an arrest or
       court disposition report.  The subject of the entry has been
18     identified with this record based upon *soft* criteria consisting of a
       name or number match.  Positive identification has *not* been made
19     because fingerprints were not received for the entries.  Use of this
       information is the receiver's responsibility."  (Italics added;
20     unnecessary capitalization omitted.)

21         Based on the italicized language, [Petitioner] asserts: "Where the
       documents, on their face, bear a warning by the government officials that prepare
22     them that they are not trustworthy, such a warning rebuts the presumption of
       trustworthiness usually afforded official documents."
23
24         We find unpersuasive [Petitioner's] assertion that the quoted language
       rendered [Petitioner's] CLETS rap sheet untrustworthy for purposes of Evidence
25     Code section 1280.  Moreover, "CLETS rap sheets have been found to be
       admissible under the public records exception to the hearsay rule (Evid. Code, §
26     1280)."  (*People v. Morris* (2008) 166 Cal.App.4th 363, 367 (*Morris*)).

27         Thus, the Supreme Court has held that an uncertified CLETS printout
       satisfied the official records exception to the hearsay rule codified under Evidence
28     Code section 1280 where a paralegal testified regarding his familiarity with the
       record keeping system and his care in obtaining the information from the record

system and where a deputy sheriff testified that the defendant did not deny the items on the printout. (*People v. Martinez* (2000) 22 Cal.4th 106 (*Martinez*).) While the high court included the testimony of the two witnesses in its rationale for finding that the official records exception was satisfied, (id. at pp. 119, 129) it relied heavily on the presumption that an official duty has been regularly performed to establish the foundational requirements of Evidence Code section 1280. (*Martinez*, *supra*, 22 Cal.4th at p. 125; Evid. Code § 664.) The high court expressly noted that with respect to the trustworthiness prong of Evidence Code section 1280, the only prong challenged by [Petitioner], "Evidence Code section 1280 'permits the court to admit an official record or report without necessarily requiring a witness to testify as to its identity and mode of preparation if the court takes judicial notice or if sufficient independent evidence shows that the record or report was prepared in such a manner as to assure its trustworthiness.' [Citation.]" (*Martinez*, *supra*, 22 Cal.4th at p. 129.)

Similarly, in *People v. Dunlap* (1993) 18 Cal.App.4th 1468 (*Dunlap*), the court held that a certified CLETS printout is admissible under the official records exception to the hearsay rule even where no witness testified regarding the preparation of the printout. (*Id*. at pp. 1477-1478.) The *Dunlap* court reasoned that a trial court may "consider the presumption that official duty was regularly performed to satisfy itself that the record was sufficiently trustworthy." (*Id*. at p. 1480.) "Both cases [i.e., Martinez and Dunlap] relied in part upon statutory reporting and recording duties in the CLETS implementing legislation, and upon the presumption that official duties are properly performed under Evidence Code section 664. [Citation.]" (*Morris*, *supra*, 166 Cal.App.4th at pp. 367-368.)

The CLETS printout in this case was certified and the trial court could rely on the presumption that the information included in that report was an official duty that was regularly performed. The trial court did not err in finding that it was prepared in a manner to assure its trustworthiness even though no witness testified regarding its preparation. The CLETS printout was properly admitted under Evidence Code section 1280.

Next, [Petitioner] contends admission of the certified CLETS printout violated his Sixth Amendment right to confrontation under *Crawford*, *supra*, 541 U.S. 36. In *Crawford*, "the high court held that the confrontation clause of the Sixth Amendment to the federal constitution prohibits 'admission of testimonial statements of . . . witness[es] who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" (*People v. Romero* (2008) 44 Cal.4th 386, 421.)

We reject [Petitioner's] argument at the outset because, as respondent correctly points out, [Petitioner] did not object on this ground in the trial court. (*Morris*, *supra*, 166 Cal.App.4th at p. 367 [*Crawford* objection not raised below is not preserved for appeal].) However, even assuming arguendo [Petitioner] had preserved his argument, we would reject it on the merits. (See *Morris*, *supra*, 166 Cal.App.4th at p. 370 [admission of a CLETS rap sheet under the public records exception to the hearsay rule does not violate Sixth Amendment because statements are nontestimonial, i.e., not obtained for the purpose of potential use in a criminal trial].) We find unpersuasive [Petitioner's] argument that the certification of the rap sheet itself violated *Crawford* because, in [Petitioner's] words, "it was prepared specifically for the purpose of certifying the documents for this particular prosecution." We agree with respondent that, although certified documents are used in criminal prosecutions, a certification merely establishes that the underlying document is an original and authentic record and does not

constitute testimonial statement within the meaning of *Crawford*.

(LD 4 at 22-25.)

A.    Procedural Bar

The California Court of Appeal rejected this because Petitioner failed to object on this ground in the trial court, citing People v. Morris, 166 Cal.App.4th 363, 367 (2008) (*Crawford* objection not raised below is not preserved for appeal.)

A federal court will not review a petitioner's claims if the state court has denied relief of those claims pursuant to a state law that is independent of federal law and adequate to support the judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Coleman v. Thompson, 501 U.S. 722, 729-30 (1989); see also Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935).  A state court's refusal to hear the merits of a claim because of petitioner's failure to follow a state procedural rule is considered a denial of relief on independent and adequate state grounds.  Harris v. Reed, 489 U.S. 255, 260-61 (1989).  This doctrine of procedural default is based on the concerns of comity and federalism. Coleman, 501 U.S. at 730-32.

There are limitations as to when a federal court should invoke procedural default and refuse to evaluate the merits of a claim because the petitioner violated a state's procedural rules.  Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263 (1989).  For California Supreme Court decisions, this means the Court must specifically have stated that it denied relief on a procedural ground.  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1993); Hunter v. Aispuro, 982 F.2d 344, 347-48 (9th Cir. 1991).  If the California Supreme Court denies a petitioner's claims without any comment or citation, the federal court must consider that it is a decision on the merits.  Hunter v. Aispuro, 982 F.2d at 347-48.

In addition, a federal court may only impose a procedural bar on claims if the procedural rule that the state used to deny relief is "firmly established and regularly followed."  O'Dell v. Thompson, 502 U.S. 995, 998 (1991) (statement of Blackmun joined by Stevens and O'Connor

25

1  respecting the denial of certiorari); Ford v. Georgia, 498 U.S. 411, 423-24 (1991); James v.

2  Kentucky, 466 U.S. 341, 348-51 (1984).  The state procedural rule used must be clear,

3  consistently applied, and well-established at the time of the petitioner's purported default.  Fields

4  v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997); Calderon v. United States Dist. Court (Bean), 96

5  F.3d 112, 129 (9th Cir. 1996), *cert. denied,* 117 S.Ct. 1569.

6        The appellate court refused to consider this claim pursuant to California's

7  contemporaneous objection rule because Petitioner's failed to challenge his sentence at the time

8  it was imposed. California's contemporaneous objection rule is consistently applied independent

9  of federal law. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir.2002); Vansickel v. White, 166

10  F.3d 953, 957 (9th Cir.1999).  Petitioner makes no showing that the contemporaneous-objection

11  rule was not an adequate and independent basis for its decision.  In addition, Petitioner has not

12  shown cause for the default or prejudice resulting from it, or that a fundamental miscarriage of

13  justice would occur if this claim is not heard.  Nor has Petitioner presented any evidence

14  establishing his actual innocence.  Therefore, Petitioner is procedurally barred from bringing this

15  claim.

16        B.    Analysis of Claim

17        The appellate court also found the claim to be without merit.  In Crawford v. Washington,

18  541 U.S. 36 (2004), the Supreme Court held that the Confrontation Clause of the Sixth

19  Amendment bars the state from introducing out-of-court statements which are testimonial in

20  nature, unless the witness is unavailable and the defendant had a prior opportunity to cross-

21  examine the declarant.  However, public records, such as a judgment, are not testimonial in

22  nature and do not fall within the Crawford exception.  United States v. Weiland, 420 F.3d 1062,

23  1077 (9th Cir. 2005) (finding various public records including fingerprints, a photograph and

24  records of conviction nontestimonial).

25        The state courts' determination of this issue was not contrary to, or an unreasonable

26  application of, clearly established Supreme Court precedent.  The California Court of Appeal

27  properly held that the admission of a CLETS rap sheet was admissible under the public records

28  exception to the hearsay rule and there was no Sixth Amendment violation because it was not

testimonial in nature.  The state court's ruling was consistent with the holding of <u>Crawford</u> and the claim is without merit.

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.       The instant petition for writ of habeas corpus be DENIED; and

2.       The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

    IT IS SO ORDERED.

**Dated:   October 31, 2011**                    **/s/ Dennis L. Beck**
UNITED STATES MAGISTRATE JUDGE